I'm not sure how you are dividing time, but it would be helpful to know, first of all. Second of all, this is a complicated case and somewhat liberal about time, so don't be too nervous about worrying about your time running out. May I proceed, Your Honor? Yes, please. Your Honor, David Cantelme from Cantelme and Brown, appearing on behalf of the legislative interveners. I have with me at council table my partner, Erin Brown. I'm having trouble hearing you. I said I have at council table my partner, Erin Brown, who represents the legislative interveners. And let me try to adjust this mic so it fits comfortably as I'm speaking. We're going to divide our time, Your Honor, to answer your question half and half with Mr. Bistro. Mr. Bistro, at my left, represents the superintendent of public instruction. So I'm going to take ten minutes and he's going to take ten minutes. I'm going to try to save two of mine for rebuttal. Now, who you actually represent is the president of the senate and the speaker of the house. Is that right? Yes, Your Honor. I have four points to make to the court. First, the Equal Education Opportunity Act does not require Arizona to adopt any specific method of funding. It can adopt any method it chooses so long as it achieves the commanded results. Two, the Dallas Unified School District, which I'll refer to as we did in the briefs as NUSD, is fixed. It succeeds. Its children learn. Third, finding a fact, number ten, in which the court held that there were incremental costs that exceeded the Group B weight is clearly erroneous. And fourth, if it is an issue within the mandate, and that's a point that Mr. Bistro will address, that is the scope of the mandate, House Bill 2064 does not violate federal law. Can you tell me whether you or any of you have in the record an accurate cost projection or estimate for the cost of educating these children? Your Honor, no one has a complete, accurate figure in the record and the reason for it. Now, there's evidence of what has been spent in the past. Is there evidence of what needs to be spent? Your Honor, there cannot be. And the reason for that is it varies widely among districts. There is no one size that fits all. A cost study necessarily inherently would short some districts and overfund others. But we don't have before us what would be a proper figure that we should order be furnished by the state. And not only do you not have that figure, nor should you do so. And the reason, Your Honor, is that all the state of Arizona is obligated to do is to provide adequate funding for the school districts to carry out their mission. And that is in the record and that is undisputed, that in fact that happens. And the reason I say that, Your Honor, if I may elaborate, the key here, the key and the judge below missed it, is that maintenance and operations funding, which is substantial in the several thousands of dollars, can be used for English language learners. So that whatever deficiency, if there is one in the group, be weight and that has not been proven. And that's why I say finding the fact 10 is clearly erroneous. And that's at page 46 of the excerpt. But wait a minute. What we have in front of us now is a motion to modify an injunction. Yes. There were... Satisfied, actually. I'm sorry? Deem it satisfied. Deem the judgment satisfied. Well, it certainly wasn't satisfied because the injunction dealt with funding requirements and did seem to require some incremental funding. And so I don't see how it could be satisfied. It seems to me that you're asking to change it prospectively, although it wasn't satisfied. Your Honor, what we're saying, I think that's probably accurate. I would state it a little bit differently. I would say that what we're asking is to recognize that the injunction as issued makes no sense anymore on the current state of facts. All right. So then you need... Well, you weren't even in case, but the original judgment was not appealed. True. So what you need now is a change. And we have it. But you may have it. I mean, I understand your change to me primarily with regard to what's happened, your alleged change with regard to what's happened in the Gallies Unified School District and to some degree what's happened in the state. But not with respect... But what you don't have is a change with respect to the matter that was addressed by the injunction. We do indeed, Your Honor. In what way? The injunction didn't come in the original judgment. I'm sorry? The injunction did not come in the original judgment. The judgment entered on January 24, 2000 was merely a declaratory judgment. The injunction followed later in the order of October 12, 2000. And that injunction initially required a cost study. Because it would force the state to underfund some districts that need more money than others. The cost study approach failed to recognize that in this highly diverse state that we have, costs vary so much among districts. Well, we can accept that. I'm sure their costs do vary. But in the statute it says that no money can go out to anybody unless the court says that the funding is adequate. Now, how can we say that? I beg to respectfully disagree, if I may, Your Honor. The statute only says that the incremental increase in group B weight from 350 to 432 would not be triggered unless the district court approved it. Maintenance and operation funding is untouched. It continues unabated. And it's more than adequate. Because all these districts for which evidence came in all satisfy the EEOA and all are funded by state money. Second, the 350 continues. Third, there are whole other sources of income to these districts that can be used for ELL instruction. Example. Not specifically for ELL instruction, but to the extent that the guide increases, all boats come up as well. My understanding is that this statute also requires that you have to credit all the federal funds, no matter what they are required to be used for. Only, Your Honor, to make an application to the Structured English Immersion Fund. Not for M&O. M&O is more than adequate. It's not in any way triggered by anything having to do with the federal offsets, the so-called offsets. Let's go back then. Yes. Was not the premise of the original judgment that that is not so. The original judgment did not even address M&O. Did not even touch it. Its premise was that there is an incremental cost in training ELL students. Yes. Over whatever other funding there is. Yes. So to that degree, it rejected the premise that the regular M&O funding is sufficient. Your Honor, I would disagree. I think what the court below in the October 12, 2000 order, which is a reported case, what that court essentially did is it went off on this cost study notion. And the cost study notion is exploded. It doesn't work. And under 60B-5, the analysis under RUFO and this court's own cases, if we're in a situation in which the injunction no longer works on the ground, we're entitled to have it modified. And what is the change that caused that approach not to work? Several. First, Arizona went to English immersion. If you look at the original judgment, if you look at findings of fact around 45 through 47. But it should work more easily because the program is now a single program. My point. My point precisely. So therefore, it should be more easier to do a cost study, not harder. Your Honor, you can't do a cost study. What the new bill provides is that each district submits its own costs based on its own circumstances, based on what it pays its teachers, based on what its costs are to run its school. Okay, but what I'm asking is under that rubric, how do you determine that there is equal education? Because of the results. The question is the opportunity. It's not necessarily dollars spent.  Let's say that you have a school in which there are only 10 children who are ELL students, but a student body of 2,000. It becomes more expensive to teach those 10 per student than you would if you had a student body as you do in Nogales, which is primarily ELL students because of economies of scale. And that's why it doesn't make any sense to do the cost study. Well, presumably, then you could have a highly tuned cost study that takes that into account. And you can then have a statute that takes that into account as well and says, you know, we will pay X amount if there's so many students and Y amount if there's so many students. It's not unimportant. Indeed, we do. We have, Your Honor, because what this statute says is it says each district costs out what your costs are. And if you're not getting enough money, you can apply to us for more. Yes, but that then has all the subtraction for the federal funds. That would be true, but it's covered by M&O regardless. I'm sorry? Is enough M&O money? In what way? Well, first of all, I'm still not clear what the answer is, why that issue was not subsumed in the original judgment, whether the M&O was adequate or not adequate. The reason it wasn't subsumed in the original judgment and the reason it really wasn't even considered in the original judgment is because the trial court focused solely on incremental costs. And in doing so, he was focusing on the old bilingual approach. And I think if you look at the findings of fact, you'll find that he noted that you've got to acquire all these teachers in Nogales and we can't get them because we can't pay enough money for them and so on. And then he went on to the cost study approach to find out what the true incremental cost was for Nogales. But the problem, Your Honor, and we know the cost. We can figure out what it costs Nogales because they pay for it and they succeed. They pay for it on existing funding. Nogales is a school district that does quite well. In fact, four of its... It does well until the high school level, but it doesn't do well. Well, every high school in Arizona has a harder problem than the elementary schools with ELL, and that's only because it's natural in our brains. A six-year-old soaks it up easier than a 15-year-old. Exactly. Exactly. So, the point is it's not to be unexpected to have a harder time at the high school than you do, and that's not proof that you don't have a program that succeeds. It just simply recognizes... Well, of course you don't have a program that succeeds. It may prove that it's more expensive and more difficult, but it doesn't succeed. Nogales does succeed. If you compare it to other districts, for example, Scottsdale Unified. Nogales ELL students do better than Scottsdale Unified, which is one of the wealthiest districts in Arizona. They do succeed, but it's relatively... At the high school level? Relatively speaking, Your Honor. Yes, at the high school. Another problem with that statute, as I see it, is that funds are cut off after two years. Not all funds, Your Honor. The only funds that are cut off at two years are the structured English immersion and the group B weight, but M&O continues unabated and compensatory instruction continues unabated. But those are not special needs. Those are not targeted funds. Your overall argument is that something, and just to get a handle on it, that something has changed since 2000 such that at that point targeted funds were necessary, but now they're not. I mean, is that the capitalization of it? Part of it. Okay. Much of it. There are other systemic changes that have occurred also, and those have indeed changed circumstances. Example, if you look at the finance of fact made by Judge Marquez, he goes off on many deficiencies in the plant, the facilities, the school buildings, and so on. Those have all been remedied. We've adopted an entirely new method of capital finance that has pumped $20 million into Nogales. But presumably that was sort of a different problem. The targeted money wasn't going to go to that. No, but he identified those. Those were big issues to him. I mean, those were huge issues to Judge Marquez, and those issues dealing with plant and capital have been dealt with entirely. Your Honor, I've asked. The remand. The remand to district court was for what? The remand was for the district court to determine what? How about the buildings? The remand, Your Honor, was to determine whether the original judgment, and that was the phrase in the remand, was satisfied. The original judgment is the judgment entered on January 24, 2000. To hold a hearing. Pardon? To hold a hearing, right? Yes. To determine whether or not the original judgment was satisfied. True. And those issues dealing with buildings were part of the original judgment. But the answer, I mean, this goes back to what I said at the beginning. I don't see how you can succeed by arguing that the original judgment was satisfied. It wasn't satisfied. You can succeed by saying that it isn't. If you are going to succeed, it has to be in the premise that, which is sort of what you're arguing, that the premises of the original judgment no longer obtained, so we shouldn't no longer have to satisfy it. Not that we did satisfy it. Your Honor, I think we can say both. And I don't think they're mutually exclusive. But I'll focus on the latter. And the reason for it is premises indeed have changed. Huge premises have changed. And I think if you look at the system in Arizona as it exists now, compared to what it existed seven years ago, the Department of Education has changed enormously with respect to ELL. Mr. Bistro will address that. Capital financing has changed. Other methods of financing have changed. If you look at the discrete issues, and this is why I say the judgment also has been satisfied, if you look at the discrete issues he identified with respect to NUSD, every one of them has been satisfied. Teachers, pay, instructional materials, class sizes, adequacy of classrooms, every discrete point Judge Marquez has identified has indeed been remedied, absolutely been remedied, and undisputedly remedied. Your Honor, I've got to get some time. Okay. No, I have one more question before you, Sajan. You said that, and maybe this is what we've been discussing, that finding a fact 10 is clearly erroneous. And that's really the core of your argument. I would say that is a core, not the only core, but absolutely one of our big points indeed. And finding the fact, it's at page 46 of the excerpts, here's why I say that it's clearly erroneous. It says, quote, plaintiff presented evidence that the per-student incremental costs of providing ELL instruction is greater than either the Group B weight of $365 or the increased weight of $444 that would be provided if this court approved HB 2064. The reason it's clearly erroneous, Your Honor, is that the only evidence that came in with respect to actual costs was not incremental. It included, and we pointed that out repeatedly, it included items that would have been incurred regardless of whether you had ELL or not had ELL. And what happened, particularly with respect to NUSD, is the superintendent arbitrarily assigned percentages on certain cost items that he thought should be attributed to ELL. That's not the definition of incremental cost. Incremental cost is only those costs that are associated specifically with ELL and would not have occurred but for ELL. And in addition, Your Honor, the other cost studies, as we pointed out, they made no attempt to satisfy Dobert. They should never have been admitted. They were clearly erroneous and they were unscientific and there's no basis to support finding the fact 10 in this record based on what came in. Okay, thank you. Your Honor, thank you for the indulgence also. May it please the Court, Your Honor, my name is Rick Bistrom. I represent the Superintendent of Public Instruction for the State of Arizona, Tom Horn, and seated at the counsel table with me is Mike Dobert, who is co-counsel. Your Honor, I'm going to deal with three issues. First, the district court failed to follow this court's mandate. Second, there is current compliance with Section 1703F. And finally, compliance with the ELL framework under the No Child Left Behind Act means that there is compliance with Section 1703F. The mandate rule required the district court to adhere to the directives of the Ninth Circuit. The district court failed to do this. The Superintendent argued in the first appeal that there had been large infusions of local, state, and federal funds and that there had been major changes in programming at Nogales in terms of class size, tutoring, teachers, academic rigor, and that there were indications that the ELL students were doing quite well. We also argued that the district court committed error because it had fined the state some $750 million per year and had denied our Rule 60b-5 motion without a hearing. This court agreed and sent it back with specific directions. This court stated in the... A holding hearing, and there wasn't, what, an eight-day hearing or something? I'm going to quote from the remand order. This court stated in the remand order that, quote, in light of changes in programming and funding since 2000, the district court must make findings of fact whether changed circumstances required modification of the court order. The district court did not do that. The district court made no findings about the effects of the change from bilingual and ESL education to structured English immersion. The district court made no findings comparing the program conditions that he describes in 2000 to the program conditions as they exist in 2006. Nor did it make findings about the changes that the Department of Education... Well, excuse me, but finding a fact, too, is the state has changed its primary model of ELL instruction from bilingual education to structured English immersion. But he didn't talk about the effects of that change. If you take a look at the original... And where is that in the mandate that he do that? I honestly think maybe you ought to move on. This doesn't seem to me to be very productive. I mean, he held a hearing. He made findings. The findings covered programming and funding. Maybe he didn't do it well, but that doesn't seem to me to have to do with the mandate. Well, I don't think that he made the kind of... In the superintendent's view, had he made the kind of specific findings that we think that he was required to do, and if he had reasoned to a conclusion, he would have found that there is current compliance with Section 1703F. That's a different question. But whether it applies to the mandate is what you're arguing now, and that, I'm suggesting, is not a fruitful area. Okay, all right. There's no compliance with Section 1703F, and federal involvement should end. Glover v. Johnson, cited in our brief, states that when a party seeks 60B-5 relief, the focus should not be on remedial steps, but whether compliance with a federal violation has been achieved. This court recognized that principle in its remand decision in this case when it cited to Clark v. Coy, which held that a court cannot require more of state officials than is necessary to comply with federal law. In this case, compliance has been achieved because the plaintiff's class now enjoys a program reasonably calculated to teach them English. There is a philosophical divide between what we say is required under Section 1703F in Flores v. Arizona and what the plaintiffs say is required, and surely a starting point for that discussion should be the actual wording of 1703F. 1703F says the following. Educational agency must take appropriate action to overcome language barriers that impede equal participation by students in its instructional programs. We say 1703F is a performance statute that says nothing about and does not require specific levels of money. It is not a funding statute. Okay, but excuse me. The hard problem for us, it seems to me, is to sort out what was in the original judgment that was not appealed and what is appropriate at the 60B-5 stage to determine what changes have occurred that would merit modifying the injunction. And so it would be helpful to me if you could separate those two because it seems to me the argument you're making now really goes to the fact that there never should have been an injunction about funding. But there was one, and it wasn't complied with, and it was not appealed. It was first not appealed, and then it wasn't complied with. So with those premises, why are you now entitled to a change for the future? All right, let's talk about the original judgment. And the judgment I'm going to talk about is the judgment that was referred to in the remand order, which is the January 24 judgment. I understand that. But the judgment in the remand order only deals with the 60B-5. Yes. All right. Your Honor, the original judgment, the original January 2000 judgment, that was a declaratory judgment action, and it was about liability. It was about liability of the state for the failure to provide sufficient oversight and resources and programs so that Nogales could provide an effective program reasonably calculated to teach ELL students English. At that particular time, Nogales had endorsed a program called bilingual education and ESL education. The district court, in that opinion, went at great lengths discussing the fact that by virtue of having a bilingual program and an ESL program that you needed to acquire teachers who could speak two languages and that it was extremely difficult to find those teachers. It also found a series of other deficiencies. It found that class sizes were too large. But it also found that the minimum base level for funding is arbitrary and capricious. There is no relation to actual funding. The defendants are violating the EEOA because the state's arbitrary and capricious allow appropriations not reasonably calculated to effectively implement and meant to allow educational theory, which it approved and NUSD adopted. They're violating the EEOA because it failed to take appropriate steps. And you seem to be arguing more broadly that the funding issue sort of had no place in this litigation, but that seems to me was lapsed with the failure to appeal. No, no, what I'm saying is that the funding was not looked at in isolation. The reason that there was inadequate funding in 2000 is because they could not hire these teachers under the bilingual and ESL programs. The reason there was problems with the funding is because they had all of these various deficiencies which the court goes on at some length to describe and discuss. In 2001, the Nogales Unified School District terminated bilingual and ESL education. The need for these specialized kinds of teachers went away just like that. And what has happened since that time... Phil, isn't there a need still for... As I understand the system now, there is a certain amount of full-time teaching of English before the kids get into regular immersion programs, is that right? No, no, all ELL kids are taught in English. They don't get any training about how to speak English? Yes, they do. Oh, sure, of course. Okay, so you need teachers to do that. Yes, and they in fact are doing that. At the Nogales Unified School District, they are in full compliance with federal law. They are doing extremely well. You asked the question, well, what about the high school, for example? You asked Mr. Katomi about the high school level. The fact of the matter is that the high school students at Nogales High School, those particular students are meeting their AMAO requirements under the No Child Left Behind Act. There are certain performance standards under No Child Left Behind, and they're meeting those performance standards. The fact of the matter is that the Nogales High School, if you take a look at how those students do, the high school students do on Aims, they are doing better than the high school students at the same level as in Scottsdale. But not better than the non-ELL students. Much worse than the non-ELL students. And you would expect that because they don't speak English very well. So if you're giving them an English test, if you're giving an ELL student an English test who is not fully proficient yet, they're certainly not going to do as well as an English student. However, if you have, but take a look at the scores in Nogales with regard to those students who have become proficient. The students who have become proficient, who were former ELL learners in Nogales Unified School District, are doing, as well as in many instances, much better than regular native English speakers. So... If we were to ask the superintendent whether with current funding levels, all of the schools in Arizona have adequate instruction for ELL students, what would the answer be? I think the answer would be yes. And the reason that we know that is look at Nogales, Your Honor. Oh, we keep looking at Nogales, which is certainly better than the rest of the state. Well, Nogales is the plaintiff class in this case. I understand this. And that class has never expanded. But Nogales is a very, very poor school district. It's one of the poorest school districts in the state of Arizona. Seventy-five to eighty percent of them are on free lunches. You mean the students are poor. You don't mean the district's poor. Yeah, well, yeah, they qualify. And it's a small border town. And you're correct, Your Honor, the students are poor. And these students are doing really quite well. And... Obviously, the school districts don't think they're doing very well because a bunch of them filed an amicus brief here on the other side. They're not too happy. Your Honor, sure. School districts, they want more money. That's what it's about. They certainly want more funding. No question about it. But the issue here is not that. The issue here is... Why this case is hard is because the two sides are sort of passing in the night. I agree with you, Your Honor. We have a complete different view about this case. Our view of this case is that the original floor's judgment was about liability. Is the state liable for... Excuse me. It would really be helpful if you... You may have a good case here, but you keep going back too far. In fact, I mean, I'm now looking at the January, June 2001 order, which says, on January 24, 2000, the court held that as a matter of law, the minimum base level funding for allowed programs was arbitrary and capricious because it bears no relation to the actual funding needed to ensure that the LEP students are achieving mastery of the state's specified essential skills. Until remedy, defendant fails to comply with the declaratory judgment and plagiars are entitled to equitable relief, which the court then proceeds to grant. So what do you mean when you keep saying that it's only about liability? It's not only about liability. Okay. Well, the original 2000 judgment was about liability. Okay. I agree with you that the judgment that you just read from is remedial in nature, which brings me to the Glover case, which I cited in this case. The point is that since 2000, there have been a whole series of actions taken with regard to remedies. In the meantime, what has happened is that Arizona went to structured English immersion. There were huge infusions of new funding that was discussed by Mr. Cantelmi. There was new programming at the Department of Education. And then on top of all that, you had the No Child Left Behind Act, which made English language learners a specific subgroup of that particular act and made Arizona accountable for having effective programs for them. And we are in compliance with the No Child Left Behind Act. The federal government would not permit us to have funding under Title I and Title III if we were providing ineffective ELL programs. Why don't you wrap up in the next minute or so, please. Okay, Your Honor. Anyway, I'll reserve my time for questions. Can I ask you if the parties have attempted mediation in this case? There has been some discussion of settlement, but no mediation, Your Honor. Would the parties you represent be amenable if we referred this to mediation? I don't know. I have not talked to my client about that. It's an interesting prospect because they're really incredibly skilled, and this is an incredibly complicated problem, which may be having some outside person involved. This is like a stage. It's feeding on itself in this particular case. This is a little disturbing that you have to… Can we refer that to our clients? Sure. Sure. Okay. Thank you. Counsel. Good morning, Your Honor. My name is Tim Hogan, representing the plaintiff's appellees in this case. Would your clients be amenable to mediation? Absolutely, Your Honor. The settlement discussions were provoked prior to trial earlier this year. We made a proposal that we thought was eminently reasonable. As you can well imagine, dealing with a legislative body in that kind of context is difficult and probably poses similar problems for participation in a mediation program. But from the plaintiff's standpoint, we certainly are. We're trying to move the case forward, trying to get to the end and to a resolution. My understanding is that there's a further order of the district court requiring compliance by the end of what it considers to be compliance by the end of the next legislative session or the end of February. Is that accurate? It is. There is an order in place entered pursuant to the plaintiff's motion for contempt. So it seems to me that reasonable people would think that mediation was almost essential in this kind of a case. Well, reasonable people might think that, Your Honor. I think that's part of the problem with a case like this because you have educational considerations, you have political considerations and financial considerations, and none are insignificant. And so they all pose obstacles, I think, to getting to that point. However, alluding to that order, Your Honor, I think that's the roadmap for successful resolution of this case. You asked earlier about the cost studies. I think the history here is one of cost studies. The judgment in this case talks about how the state did its own cost study. And so after the judgment was issued, and by the way, I'm going to get to this M&O issue. I do want to cover that because it is discussed in the judgment. Do you want to argue on behalf of the plaintiff? Are you doing the complete argument? Well, I was going to say I'm splitting my time with counsel for the state, Mr. Cardenas, who's going to address federal funding issues. It seems to me if Israel and Palestine can agree to sit down, maybe you folks can too. You're looking at a willing party, Your Honor. I don't know what else to say. We have tried to be flexible here. And, in fact, that's what I was going to get back to. In terms of we're not fixated on cost studies, although I think historically that was the basis for the case moving forward. And the state itself initiated this massive cost study, the National Conference of State Legislatures, which, by the way, does have the kind of data you're looking for in there. If you were still looking for a per-student dollar number. Was that incomplete for some reason? Well, there were two parts to the study. One was to survey school districts to find out what they were spending. That part was incomplete because they had an insufficient number of school districts providing responsive data. And so they ended up with only seven or 14 school districts, and NCSL had to concede that that was incomplete. The other part of the cost study, though, was to figure out what it should be costing to provide education to English language learners. And they convened professional panels for that purpose, both nationally and at the state level. And so that has never been subject to any kind of dispute or criticism that it's incomplete. People can disagree about the results. And that generated a number of incremental costs for Arizona's type of plan. Absolutely. And it was based. And is that one of the bases for the evidentiary challenge? Is there any of the information there, or was that an expert who testified? That, as I say, that study was initiated by the legislature with the earlier legislation from 2001, House Bill 2010. That study was admitted by the district court. It was actually filed by the state prior to the evidentiary hearing, long prior. So we seem to have a focus now on this finding of fact 10, which this would be relevant to, right, as to whether there is an incremental cost, essentially. Well, I think finding of fact 10 references the idea that the group B weight in Arizona is now something like $365 per English language learner student. The plaintiffs produced evidence at the trial showing from five school districts, among other evidence, showing that those school districts were spending far in excess of that amount. For Nogales, it was $1,570 per student. For Glendale, which is one of them. And they're complaining that those aren't really incremental costs. They're saying they're not really incremental. But that was a finding of fact by the district court judge. They're saying that's clearly erroneous because of various defects. So what about this panel that you're talking about? What was their number? It was a series of numbers depending on grade and ability level of the English language learners. And it differed by both the state panel and by the national panel of experts that was convened by the national panel. Did they support the finding that the incremental cost is more than $365? Well, the finding, if I recall correctly, if you average all the numbers that you see in that study, it's somewhere around $1,800 per student, which is consistent with the evidence. Incremental cost. Incremental cost, which is consistent with the evidence that we produced at trial from the five school districts. But I don't want to get stuck on this idea of cost studies. We've never been.  Absolutely, Your Honor, and I think the district court's reference was to the evidence produced by the plaintiffs showing incremental costs ranging from $1,570 for Nogales to over $3,000 for Glendale Union High School District. Plus, there was survey testimony entered into evidence. There was the NCSL cost study entered into evidence. All of the cost study that's been developed, there's a 2001 cost study. What about the statute? The statute doesn't say anything about funding as such. It says there has to be an appropriate education to equalize. And it does appear that a lot of the functional problems, at least in Nogales, and then there's the question of is Nogales what matters, seem to have improved substantially. So why doesn't, would that justify a 60B-5 motion, granting 60B-5 motion, essentially to take the focus off funding on this area if funding no longer seems to be the problem? The judgment requires that the state provide funding based on actual cost. That's what the judgment provides. Right, the question, and what's strange about this case, or disturbing, is that as I understand most of the 60B-5 cases in institutional litigation in which modifications have been granted, there was compliance first. And then they come and say, but we don't need to comply anymore. Here there was never compliance, as I understand it. Does that matter as to 60B-5? It matters significantly because what in effect is happening is a collateral challenge to the Castaneda analysis that was adopted by the district court in the judgment. Castaneda is very clear about what's. Castaneda says nothing about funding, specifically. And they generate an issue about funding, but the three prongs aren't about funding. Talks about personnel, practices, and resources. I don't know what that is if it's not funding. I mean, you can dress up those terms all you want, but dollars are dollars. Personnel, practices, and resources are three terms that are used in Castaneda, and they all cost money. And the defendants have never disputed that funding is an element of the Castaneda analysis. The district court, rightly or wrongly, it's too late to debate that point, way too late, rightly or wrongly adopted the Castaneda analysis, very clearly said in the judgment, you've got to fund ELL programs based on their costs. That has never happened. Looking at student results from one year to the next is a very, and in fact, Castaneda rejects that way of looking at whether there's compliance. Suppose that, as I understand their argument, and you said you were going to address this M&L thing. I mean, suppose Arizona all of a sudden got very rich and just gave the districts $10,000 per student for every student. And that that was just so much money that they could do whatever they wanted, including funding ELL. Would that be okay? It's a good question, Your Honor. It's obviously not what happened in this case and still is not what is happening in this case. I think there's an argument to be made that if you cannot, if the state cannot demonstrate the funding that's being dedicated to the needs of ELL students, because otherwise you have this, let's say you have $10,000 per student, and I have 10 ELLs in my school district and you have 1,000. In my school district, the rest of the students, which include ELLs, are going to get close to their $10,000. In your school district, including ELLs, the base funding is going to be far less than $10,000 for the basic education. So you have that differential, and I think that that's why there has to be some analysis of the, some separate analysis, and all states do it, some separate analysis of funding and programmatic issues for English language learners. Otherwise, you've got a differential built into the system for English language learners themselves in terms of the very basic education they get, not the incremental for English proficiency services, but the very basic education. Let me address the M&O. But those numbers, of course, are averages. I mean, you have children who, you have disabled children and you have English language learners and you have gifted children and you have children who are musicians and so on, and the numbers are averages so that if they get high enough, it may be that they should be able to take account for all that differentiation. Maybe there is a number that's sufficiently high that would do that, Your Honor, but we're nowhere close to that in this case. And that does go to the M&O question because this is kind of a newfound argument for the defendants here that, well, gee, we fund billions of dollars, you can just take that money and apply it to ELLs and presumably to special education children and gifted children. You can do all things for all people with this M&O funding. But it was addressed in the judgment. And let me refer you specifically to finding a fact number four in the judgment. Now I'm referring to the January 2000 where the entire school finance scheme was presented in evidence at the trial in this case. The court talks about this being a foundation system, which is the kind we've been talking about where you have an average base level amount for each student and then you have these add-ons. But the finding that I want to particularly direct your attention to is finding effect number 20, which says without a voter approved override, Nogales can only increase LEP funding by shifting money from non-LEP student apportionments. And M&O is not necessarily a term of art here. That's what we're talking about, Your Honor. We're talking about the M&O funding. And the court goes on to say just, in effect, what I've just explained about how that would account for a reduction for other students. I'm sorry. I'm going to ask on effect number 20. What in there addresses the M&O issue? The whole paragraph is about it, Your Honor. But the very first sentence says without a voter approved override, Nogales can only increase its funding for English language learners by shifting money from non-English language learner student apportionments. Is that broader than M&O? It's everything. I mean, it is, you know, 90 plus percent or whatever of the money that school districts receive for basic education purposes. But what is 90 percent? This non-LEP student apportionment. But what proportion of the money is M&O money? Oh, yeah. I mean, on a statewide basis, it's a very high percentage, Your Honor. What does M&O stand for, by the way? Pardon? Something in operations. Maintenance and operations. It is a very high percentage. Sounds like buildings. Right, right. Not to be confused with utility, which is O&M. What is your point that the representation made by opposing counsel was that M&O money can properly be spent for ELL instruction? So what's your counsel, what are you saying? Well, I'm saying that that was subsumed within the judgment. The whole finance system was presented to the court in 1990. Does that mean that the court said that M&O money cannot be spent? That's right. That's right, Your Honor. The court implied in the court's judgment is that we're going to look at the amount of money that you have specifically designated for ELL students, this group B-weight. Well, he clearly isn't telling Arizonans they can't spend M&O money for ELL. He's simply saying it's not going to be enough. That's correct, and that's why I didn't say that, Your Honor, because school districts are spending their M&O on ELL students. I don't understand your point. The opposing counsel's point was the injunction should be modified because now we've increased the amount of money that's spent on ELL programs, including M&O money, which is adequate to give proper education or equal education opportunities. That is incorrect, Your Honor. What is incorrect? That's not what they said? Right. I think what has happened is that M&O funding has increased. That's base-level funding for average funding for all students has increased since the judgment was entered, but the focus of the judgment was not on this general funding because that's intended for everybody and intended for ELLs, too, for their basic education, not for their language acquisition. The money that is intended for their language acquisition is the additional amount. You don't take issue with the fact that M&O money can properly be spent for ELL instruction, but you're saying there should be targeted money for ELL instruction. There is targeted money. It is the group B weight, and that is the amount that the state, the district court focused on in the 2000 judgment. You're not communicating with me. I don't understand what you're saying. I apologize for the confusion, Your Honor. You get so much for each student, and if it's an average student who's not an ELL or has special education issues, you get $3,000 for that student, and that's to provide reading, writing, and arithmetic, the standard education. Is that M&O money? That is M&O money. Okay. Then you get, and maybe this is where the confusion comes in, then if that student is also an English language learner, you get additional M&O money. It's all comes under the heading of M&O money. Right, but it is a weight, and maybe that's where I've been mischaracterizing it, and I apologize. It's all M&O in that sense. It is a weight that you add on to that $3,000 that says, okay, this is to recognize that it's going to cost you more to educate this student than the average student because of English language learner issues. Can you wrap up after Judge Rawson's question so we can hear from the staff? So why would a closing counsel focus on the fact that M&O money sort of bridges the gap that was seen to exist by the district court? Well, I don't know, Your Honor, because that claim could have been made at the trial in 1999, and it was part of the evidence produced by the plaintiffs at the trial in 1999, and it was discussed by the court in the judgment that was issued in 2000. I think the defendant's theory is, well, there's a bunch of money. None of it is specifically earmarked for English language learners, but there's a bunch of money, and you can use that if you run into them. If the money that we've specifically allocated for English language learners isn't enough, you can just dip into the money that's meant for the basic education of all children.  Thank you, Your Honor. I'm going to give you about seven, eight minutes. Thank you, Your Honor. Get a little controller for this. Go ahead. Good morning. My name is Josiah Cardenas, and along with my co-counsel, Susan Segal, of the Arizona Attorney General's Office, I represent the state of Arizona and the Arizona State Board of Education. I think with respect to Judge Fletcher's question about mediation and Judge Rawson's question, we're neither Israel nor Palestine. I think we're Lebanon. We're stuck in between two warring parties. The fact is that when this lawsuit was originally filed, the state opposed the plaintiff's lawsuit. We lost. That decision was not appealed. We are now focused on attempting to comply with the lawful order of a federal district court. The legislature and the executive have been at odds in terms of what compliance looks like. There have been attempts to do that. The governor, I'm sure, would not oppose mediation if there was any realistic chance that it could succeed. But that's the problem here. In fact, in the most recent round of briefing in the court below, this is in connection with sanctions, the interveners took the position that they cannot bind the legislature. They are simply two individual members of the legislature. So that's a reason why we don't see anything. What we've got is a Republican legislature and a Democratic governor. Is that our problem? Well, Your Honor, it was a Republican governor and a Republican superintendent of public instruction that did not appeal the original order from Judge Marcus. What we have is a statute that the governor allowed to go into effect even though she had serious misgivings because the legislature insisted that what it wanted was it stay in court, that the governor shouldn't decide whether or not this complied with the floor's order. So they created a statute, HB 2064, which is the legislature's attempt at compliance with the district court's order. But interestingly, the one thing I haven't heard from the defendants or on the defendant's side is a defense of the statute. The argument appears to be that the statute is simply irrelevant, and that's the argument in the briefs, too. I mean, there's near close to a concession that the statute is not valid if the injunction is not modified. That's how I'm reading the situation. I'm going to ask them that when they stand up again, but that's certainly how I'm reading the situation. Because the statute is indefensible. It was, though, the intent of the legislature that this be its compliance with the court's orders. That's made very clear in Section 14 of the statute, which goes on about seven or eight paragraphs stating the intent of the legislation. It's also clear in Section 15, which is the conditional enactment provision, which says this will increase funding if the court approves and finds that this complies with all its orders. So it's very clear that the legislature's view is that this complies with the court's order. And in one respect, it does take us closer to compliance. As the court noted, compliance in this case would mean coming up with a funding system that is rationally related in terms of funding to the actual cost of ELL instruction. And the statute, because it holds out the promise of actually determining the cost of ELL instruction, does move us one step closer. That's why this whole issue of cost studies is irrelevant. We are past that. Even the district court judge is no longer requiring that. What he has said most recently is you have to fund your models, which you say you will come up with and you will determine the cost of, fund those, and that's what I'm ordering you to do now. The models exist yet? The models are almost complete. I don't know what the latest report on them is. They are a year behind schedule. And are they going to have funding numbers attached to them? Yes, Your Honor. The way the statute is constructed, you're supposed to develop the models, then the school districts are supposed to submit budget requests based on those models. And they're supposed to say this is how much the implementation of that model would cost us in our school district. And incremental costs. And incremental costs. And the statute presumes that those incremental costs will exceed group B weights because what it provides is you get your group B weights and then you get the additional amounts of money by which the actual costs exceed that. The problem and the reason why the appellants have run away from the statute is that it impermissibly then deducts from the actual cost federal funds. And you can't do that. That's a violation of federal law. And it also means that by definition the state's funds will never actually equal actual costs. So that's why it's impossible to argue that HB 2064, which is the state's funding scheme, is responsible for this. The argument, the main argument on the other side, is look at McGalley's. McGalley's hasn't gotten the money you say they need, but they've made massive changes in administration and implementation which have made huge changes in the way in which children succeed or don't succeed, or it made them much more successful. And that proves that money is the point and that the changes in McGalley's mean that McGalley's doesn't need the money. That's how I understand it. That's what they say, Your Honor. The reality is they're focused on the equity branch of Rule 635, which says you can show significantly changed circumstances in the law. And they're saying the changed circumstances are that it now turns out that McGalley's doesn't need the money anymore. That's the shorthand of what I'm understanding them to say. Well, what the district court judge found was that success in McGalley's is bleeding at best, and that's finding a fact that's entitled to deference by the court and supported by the record. And there are several things to look at there, including the evidence of performance on Ames tests and so forth. Look at what the superintendent of McGalley's Union School District actually said in terms of his concerns about ELL performance. He's proud of how they're doing. He has expressed concerns. But even beyond that, take the evidence that they rely upon as proof of how great things are now in McGalley's. They cite this survey for the proposition that ELL students in McGalley's are now doing great and tout the performance of four elementary schools on that test. Now, in our briefs, we explained that the survey doesn't show anything of the sort. But assume that it does. What that means, then, is you have four schools out of ten that are doing well by that measure. But they're also just doing well relative to other ELL students, as I understand, and not relevant to other non-ELL students. Well, that's what this supposedly shows, that if you look at the ELL students in McGalley's and rank them against 628 other schools with ELL students in terms of students who were ELLs in 2003 and how they did on the Ames test in 2005, you've got four elementary schools in the top ten. But I don't see why that's relevant. That's our point, is that that is, at best, mixed bag in terms of how students are actually performing. But also, if none of the districts have enough money or have enough incremental money, then how they do relative to each other is going to depend on how well they're running and so on. But that isn't to prove that all of them don't need more money. And I agree, and I'm simply responding to what they claim is the evidence of that. And I would also point out that the other six schools in the Nogales School District, most of them are doing pretty terribly. You've got the next best one is at number 42, then it drops down to 152, then 165. You've got a school, one of the middle schools at 409th. You've got the high school, which is 575th. And then the alternative high school, which is 625th out of 628. And then if you look at all of the ELLs covered by this survey in Nogales, it shows 50% of them, almost 50% are failing. So at best, the evidence of things being great in Nogales is a mixed bag, and therefore the district court's finding a fact that success is at best fleeting is entitled to deference, and there's no basis for finding that the appellants carried the burden of proof for showing significantly changed factual circumstances. And by the way, this is not the kind of factual circumstance that the Rule 60b-5 case is talking about. They're concerned with changes in factual circumstances that make it inequitable to continue to enforce the judgment. You can't say that you have to modify an order that simply says provide funding for the classes that presumably will make these children successful, that there's anything inequitable about that. Our position is that let me address a couple more points quickly, and then I'd like to talk about what I think the court should do. On the question of whether Judge Marcus considered the availability of other funding, I think it's clear for the reasons that Mr. Hogan said. I would also direct the court's attention to finding a fact number 12 and finding a fact number 54 in Judge Marcus's 2000 order, where in number 12, he notes that there are no limitations or restrictions placed on the funding, so a district may use the money as it sees fit. These are from other sources. And he says, for example, a district may spend only $50 per LEP student on LAL programs instead of the $150 allocated by the state, or it may exceed the state's minimum and spend more. In number 54, he notes the testimony of Ms. Doan that NUSD, in fact, spends more on its LAL programs than the amount of money. I'm a little confused. There is no number 54. 54 in the January 2000 order. Oh, I see. I'll go back. I'm sorry. Whether the court even considered the argument that because there may be other monies available, you don't have to worry about what's specifically allocated. And there he said, to acquire funding for the LAL program, NUSD robs from Peter to pay Paul. So I think the reality is those positions were set forth in January 2000. The court did not accept them. Now, there's nothing, I think, in the EOA or in Judge Marcus's order that specifically requires you to use a particular source of funding. But the reality is that's how we do it in Arizona. We determine what a base amount of funding is that's necessary for the basic education. And then we say for special needs, and ELL instruction is one of them, we will provide additional sums of money. And this statute assumes that you need additional sums of money. The witnesses who testified at the hearing said you have to spend more money on ELL students. And that's why the focus is properly on HB 2064. In our briefs, we set forth the reasons why it violates federal law in three ways. You have the supplanting issue, and you don't need the Department of Education, the U.S. Department of Education, to tell us it's supplanting. It's classic, presumptive supplanting. Look at this court's decision in Hawaii v. Bell. Look at Judge Schwarzer's decision in Alexander v. Califano, and it's absolutely clear that this is classic supplanting. The issue of the violation of 7902 of the NCLB is clear. It's so clear that the superintendent doesn't just run away from this. He ignores it entirely. It's not discussed in his brief. And that's because Section 7902 specifically prohibits what HB 2064 specifically requires, and that's consideration of federal funds in determining the amount of state aid. Okay, thank you. Is there anything else pressing? Yes, simply that what we need here is a prompt ruling from this court because my clients are as anxious as anyone else to see an end to this litigation. But the only way to get there is a prompt ruling. And what is your bottom line answer on the mediation? Is it worth a shot? I would have to consult with the governor, my client. But as I said, my guess is she would be supportive if there were any realistic possibility. But how would we know that? We wouldn't know if that's a realistic possibility. Well, I think part of it, and it's not necessarily a lack of goodwill with respect to the legislature, but as I said, the leadership of the legislature has said we cannot control. And I think to a certain extent that's true. They cannot speak for all 90 members of the legislature and guarantee that there would be a resolution, and that's a problem. What we need is a prompt ruling. Let the legislature. They said they wanted their day in court. They've had their day in court. They can go back, fix HB 2064, and make it compliant. And they're almost there. What they need to do is simply delete these offsets, delete the reduction of funding. And the two-year limit, I gather, as well. That's what I'm getting at. In that respect, the legislation, which in some respects is good and is an improvement, as I indicated before, is a huge step backwards because then we're back to $74 per ELL student, which is less than half of the $150 that Judge Marcus found. You mean after the two years? After the two years. And these are kids who are still ELL students. And what makes it even worse is HB 2064 prohibits school district from using those dollars to fund the core ELL instructional programs that presumably, and by definition, these kids still need. Okay. Thank you very much. Thank you very much, Your Honor. Counsel. Your Honor. You have an answer to my question? I do, indeed. But I'd like to answer a point that Mr. Cardenas has just made, and that's in the compensatory fund. That's not accurate at all. The compensatory fund is there to help these kids, and it goes way beyond two years. There's no two-year cutoff on the compensatory fund. Absolutely not. That's nowhere in the statute. No, we understand that. But that, I mean, there are two problems, as I understand it. One is the offset problem, and the other is the two years on the money that isn't, doesn't have the offset problem. And let me answer your question, and then I'll answer that question because I know it's, And I'm assuming your question is, are we conceding the statute is invalid? Absolutely not. The statute's not invalid in any way, shape, or form. We have an argument. It's hard to buy, Counsel. Pardon? That's a little hard to buy, Counsel. Well, Your Honor, I'll do my best to sell you on it, and I'll tell you why I say that. The so-called offsets that this is supplanting on its face is absolutely not true. If you look at the statute that they cited, their linchpin statute is 20-7902. That's their linchpin statute. And if you read that statute, what it says is that you cannot take into consideration federal money when determining what a free public education is. Free public education is a defined term. It is the base, and it actually subsumes in 8101, 20-8101. It subsumes the state law definition. State law defines the base and does not include ELL within the base. So if we're going to talk about a free public education, which is their linchpin statute, it does not include ELL instruction, and therefore it cannot be supplanted because that is not embraced by that statute. Now, what they omit, what they do not tell you, is that there's a specific exemption that Congress wrote in on supplanting. And I'll give you the slide for it, if I might. Indeed it is, Your Honor. Indeed it is. And that exemption is recognized for Title I. It's been complied with, and the reason is because it gets back to the base, the notion of base. Base is your basic public education, and anything above that is supplemental and falls within that exemption. Now, to continue on supplanting, the statutes that they cite, and these are 20 U.S.C. Sections 6314, 6315, 6825, 6623, 6613, all refer to LEAs, local education agencies. They do not refer to FEAs, state education agencies. So by their own terms, Your Honor, they do not apply. By their own terms, they do not apply. Now, I would like to address a point that Mr. Hogan made. On the National Conference of State Legislatures study, you'll recall that point, Your Honor. You had the colloquy with him. That's Exhibit 19 in the record. If you go to page 14 of that exhibit, it says that it's incomplete. It says, I'm sorry? That it is incomplete. What's more, there was no foundation laid for it. There was no showing that it complied with the Daubert Standards to come in as expert opinion, and no one testified from it. It's hearsay. Can we go back to the exclusion that you were referencing, 20 U.S. Code Section 6321D? Yes, Your Honor. Okay, now why do you say that this exclusion applies? Because the funding that we're talking about is supplemental. It is not part of the base. And when it's supplemental, Congress specifically created this exemption so that states would put money into supplemental funding and then not get dinged by it by it being wrapped into the base. It says supplemental funds that meet the intent and purpose of this part. Yes, indeed. And ELL is part of that part now with No Child Left Behind. No Child Left Behind has specifically brought it in. And in terms of the changes, President Berzon, the point that you had made, No Child Left Behind is huge. I mean, it has changed everything. As Mr. Bisser said, how can you meet No Child Left Behind and yet not meet EEOA? There are two separate statutes. There are two separate statutes, indeed, Your Honor, but they go to the same point, and that is whether or not you provide an adequate opportunity to English language learners. And the Department of Education has defined what adequate progress is to help these children. It's inconceivable that you would have one standard on what we should be doing, telling the states, you've got to follow this, and then saying others are over here. No Child Left Behind is largely, it's a school-based measure, right? Yes.  And, therefore, it doesn't match up very well with the concern here for one-on-one funding, essentially. You can't measure schools without measuring kids. Oh, right, but you're measuring average kids. You would be measuring a component as ELL. You cannot have adequate yearly progress if your ELL children are not making it. And so, yes, it is an average of ELL students. I'm not sure about this, but doesn't No Child Left Behind, with regard to ELL, have a fairly slow start-up, I mean, in terms of what percentage of kids have to be? True, I agree with that. And there's no such kind of incremental notion in the EOA. Well, that's true, but the question is whether we're providing an equal opportunity. You're essentially arguing for, essentially, an appeal by implication. True, that's the argument that I made, absolutely. Very, very rare. Granted, but this is a unique situation, Your Honor. It is, indeed, a unique situation. So you're basically saying that the EOA provision with regard to ELL learners, that they have equal opportunity now as opposed to 10 years from now, is no longer there. No, let me restate so I can be very precise. What I'm saying is that No Child Left Behind does not repeal by implication EEOA. What it does is it makes the Costaneda analysis of how we enforce EEOA, it makes that obsolete. It makes Costaneda, which is judge-made and freely admitted by the Fifth Circuit, not a task they really wanted to do. They had no choice because Congress left it so easy. But even if we washed out Costaneda, it still seems to me that there is a distinction between appropriate education now for each child and a sort of more aspirational, maybe realistic, but incremental view, which is what No Child Left Behind is, which is devoted to measurements and school-wise judgments and ways of getting there but doesn't wash out the underlying current requirements. Let's turn it in reverse. If you're not meeting EEOA, you cannot meet No Child Left Behind. Why is that? Because you're not providing adequate opportunity, and you'd be graded down under EEOA. The penalty wouldn't fall immediately because it is a period of... I guess my view of No Child Left Behind is that it's a kind of realistic statute that says, well, people really aren't doing this, and we're going to create incentives to get them to do it in the long run, but we haven't eliminated the requirement that they really have to do it. Your Honor, I don't see how you can mesh the two without saying that if you don't meet EEOA, you can meet adequate and yearly progress or satisfy No Child Left Behind. The U.S. Department of Education has come down on you big time. The last point that I would like to make, Your Honor, and I do appreciate the indulgence, and that is the point made by Mr. Cardenas that there's a finding of fact that success was fleeting at best. We have the finding of fact. I'd like to know what number that is. There's no number for that. That's not a fact. I actually did see such a thing when I was reading. I can't find it now, but I do remember reading that sentence. I don't know where it is. But thank you. We will look for it. All right. Thank you very much. If you could forego this, we are really over. Is there something you really need to say? All right. 90 seconds. All right. Let's do it in a minute and a half. Okay. Your Honor, I think you hit on something. One of the problems that we have in this case is we are dealing with remedies when the wrong no longer exists in this particular case. And I would cite you to a case that I cited in my brief. I'm going to close with this particular quote, and I'll make this very brief. The words in Glover are pertinent here. The details of the district court's remedial plans and orders are not ends in themselves. They are merely a means to an end. If the defendant can demonstrate that they have remedied the constitutional violations found in 1979, even without complying with the details of previous orders, they must be permitted to do so. And if they do so, federal court oversight must be terminated. Your Honor, the wrongs no longer exist in Nogales. They have effective programs. Every single person that testified at that trial said that these students have effective programs that are reasonably calculated to allow a motivated student. Okay. Now you're getting rhetorical and we don't have time. Thank you very much. Thank all of you for a very useful argument in a very hard case. I'm sure you've seen a lot of each other over the years. The case of Flores v. State of Arizona is submitted. Thank you very much.
judges: Fletcher, Berzon, Rawlinson